**UNITED STATES of America,**
**Plaintiff,**

v.

**NATIONAL DAIRY PRODUCTS CORPORATION and Raymond J. Wise,**
**Defendants.**

**No. 20542.**

United States District Court,
W. D. Missouri, W. D.

May 12, 1970.

John E. Sarbaugh, Chief, Antitrust Div., Chicago, Ill., for plaintiff.

John Chadwell, Chicago, Ill., John H. Lashly, St. Louis, Mo., Martin J. Purcell, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I

Defendant Raymond J. Wise has filed a petition for writ of error *coram nobis* to vacate the judgment of conviction entered against him in this cause on June 29, 1964. Mr. Wise was named and convicted as a co-defendant of National Dairy in Counts XI, XII, and XIII of the indictment. Both defendants' post-trial motions were denied for reasons stated in 231 F.Supp. 663. Both defendants appealed. On November 30, 1964, for appropriate personal reasons related to the health of his wife, defendant Wise dismissed his appeal. Appropriate orders were thereafter entered in this Court to maintain judicial control of Mr. Wise's case until after the final determination of National Dairy's appeal.

National Dairy's appeal followed the course reflected in 350 F.2d 321 (8th Cir., 1965); 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995 (1966); 262 F.Supp. 447 (W.D.Mo.,1967); 384 F.2d 457 (8th Cir., 1967); and 390 U.S. 957, 88 S.Ct. 1032, 19 L.Ed.2d 1151 (1968), with the ultimate result that National Dairy's convictions in regard to ten of the counts of the indictment were affirmed, in none of which was Mr. Wise named as a co-defendant, but National Dairy's convictions in regard to Counts XI, XII and XIII, in which Mr. Wise was named as a co-defendant, were reversed and remanded for a new trial. The Government, for appropriate reasons stated of record, and without objection, dismissed Counts XI, XII, and XIII on May 9, 1968, as to National Dairy.

On the same day we entered an order, approved by both sides, which vacated and set aside the $52,500 fine imposed against Mr. Wise and which terminated the probation granted him under a modified order. The question of whether Mr. Wise's conviction should be vacated and set aside had been the subject of discussion between the parties but this Court

was neither requested, nor was it required by law, to make a definitive ruling on that question in light of the parties' agreement on an approved order which afforded Mr. Wise full practical relief under the circumstances which then existed.

It is therefore apparent that full relief from all the then existing consequences of Mr. Wise's judgment of conviction was granted Mr. Wise by our order of May 9, 1968, without any objection being registered on the part of the Government. It is also obvious that a grant of additional relief in regard to other consequences of Mr. Wise's conviction which came into being since our order of May 9, 1968, was entered would not have any practical effect so far as the criminal case is concerned; our earlier grant of relief, made pursuant to the order approved by counsel for all parties, effectively relieved Mr. Wise of all obligation to pay any fine and terminated his sentence of probation.

The significant circumstance which came into being after our order of May 9, 1968 was the action taken in June, 1968 by the plaintiffs in the numerous pending civil treble damage antitrust actions which, for the first time, named Mr. Wise as a party defendant.

It is, of course, apparent that the only reason why Mr. Wise presently seeks to have his judgments of conviction fully set aside and vacated is to prevent their introduction in evidence against him in the pending civil treble damage antitrust actions. There can be little doubt that Mr. Wise would not have filed his pending *coram nobis* petition except for the fact that the plaintiffs in the civil treble damage cases have definitively indicated in pretrial proceedings in those cases that they intend to attempt to seek the benefit of the collateral consequence which a criminal conviction has under Section 5

of the Clayton Act in the trial of the civil treble damage actions.

When the question of whether adequate and full relief should have been granted on May 9, 1968 in regard to all the then existing consequences of Mr. Wise's conviction, the Government properly determined that justice required that it not oppose the granting of such relief. We are not suggesting, of course, that the Government should not have raised the question with defense counsel in regard to whether Mr. Wise's conviction should have been set aside back in May of 1968. Nor are we suggesting that the Government should not have reiterated its position in connection with the pending petition for *coram nobis*. The question presented, although it is one unlikely to be presented under similar circumstances in very many cases, is one which should be judicially determined, particularly when the Government's general duties in regard to the enforcement of the antitrust laws of the United States are considered.

We are suggesting, however, that we do not agree with the concluding statement in the *amicus* brief filed on behalf of the civil treble damage plaintiffs that the "granting a writ of error *coram nobis* vacating the judgment and conviction of defendant Wise would violate a public policy with respect to enforcement of the anti-trust laws." [1] We believe the plaintiffs in the civil cases are on much sounder ground when they suggest that "It would be improper for the Court to consider the effect the granting of a writ * * * might have in simplifying the civil actions presently pending before the Court" and when they suggest that "The principal criteria which should guide the Court in the determination of the merits of defendant Wise's petition is the effect of the conviction on defendant Wise, either directly or collaterally."

1. Nor do we agree with *amicus* plaintiffs' similar statement on page 2 of their brief, that "the Court is very familiar with the extensive undertaking which the Government engaged in in its prosecution and conviction of defendant Wise, and, at this late date, to cause that undertaking to be for naught flies in the face of the public policy which dictates strict and strenuous enforcement of the anti-trust laws."

## II

The Government's basic contention that "the judgment of guilt as to Mr. Wise is irrevocable and cannot be changed" rest primarily upon language from the majority opinion of Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), and upon lower federal court cases which rely upon that language. *Sunal* and the vast majority of the other cases upon which the Government relies were decided many years before the Supreme Court's 1963 landmark postconviction trilogy of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1962); and Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Sanders v. United States, a Section 2255 case, stated that "the principles developed" in Fay v. Noia and Townsend v. Sain (which were state prisoner habeas corpus cases) in regard to "the circumstances under which a prisoner may be foreclosed from federal collateral relief * * * govern equally" in a Section 2255 proceeding. The Government concedes that principles applicable to a Section 2255 motion are also applicable to a *coram nobis* proceeding.

In Stubenrouch v. Sheriff of St. Louis County, Clayton, Missouri, (W.D.Mo., 1966) 260 F.Supp. 910, 911, this Court recognized the small area of *coram nobis* jurisdiction which a federal prisoner may still invoke. We there stated:

> United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 * * * (1954), teaches that in regard to federal prisoners, jurisdiction in the nature of *coram nobis* is conferred upon a federal committing court by the All Writs Section of the Judicial Code (28 U.S.C. § 1651(a)). That jurisdiction, however, extends only to provide a postconviction remedy for federal convicts not otherwise provided by Section 2255 of Title 28, United States Code, in order that the validity of sentences already served or the validity of sentences to be served may be tested in the partic-

ular federal court that imposed the particular sentence involved. See Burns v. United States, (W.D.Mo., 1962) 210 F.Supp. 528 at 530. [260 F.Supp. at 911]

As early as 1962, in Burns v. United States, *supra*, this Court recognized that the continued existence of federal *coram nobis* jurisdiction after the promulgation of Civil Rule 60(b) and the passage of Section 2255 apparently was something of a juridical accident, see 210 F.Supp. at 530–531. Following United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), we there held that "Section 2255 has occupied the entire field of collateral attack excepting only that *coram nobis* is presently available to test the validity of sentences completely served * * * and to test the validity of sentences yet to be served." We adhere to the conclusion stated.

The important point of beginning, however, is recognition that neither the jurisdictional base nor the form under which postconviction relief is sought by either a state or federal prisoner is particularly important. The principles and standards to be applied are those which have, for the most part, been articulated and developed since the Supreme Court's 1963 habeas corpus trilogy.

We view *Morgan's* recognition of *coram nobis* jurisdiction as simply a determination that Section 1651(a) is broad enough to provide commensurate postconviction jurisdiction for federal prisoners who fall outside the "custody" requirement of Section 2255. We also conclude that one of the commands of the 1963 Supreme Court trilogy was to place primary focus upon the substance of a petitioner's right to postconviction relief rather than upon the form or basis of how federal postconviction jurisdiction may have been invoked. We are convinced that all postconviction cases must be read in light of the fundamental change in approach reflected by the 1963 trilogy and that earlier cases which reflect approved judicial reluctance to reach the

merits of a particular postconviction claim must be read and applied with appropriate caution and restraint.

There can be no doubt that Sunal v. Large recognized and applied the frequently articulated traditional "general rule * * * that the writ of *habeas corpus* will not be allowed to do service for an appeal" (332 U.S. at 178, 67 S.Ct. at 1590).

But that case also explicitly recognized that the traditional general rule was "not an absolute one" (332 U.S. at 179, 67 S.Ct. 1588). Indeed, the majority opinion listed numerous exceptions in which the exercise of habeas corpus jurisdiction had "done service for an appeal" (332 U.S. at 179, 67 S.Ct. 1588). But the Supreme Court decided not to permit postconviction relief under one of the many exceptions recognized in Sunal because "we are dealing * * * with a problem which has radiations far beyond the present cases" (332 U.S. at 181, 67 S.Ct. at 1592).[2] Indeed, the Court was dealing with every Jehovah's Witness in the United States who had been convicted of violation of the Selective Service Act over a seven year period in which judicial attack on a Local Board's classification had not been permitted.

The dissenting opinions of Mr. Justice Frankfurter and Mr. Justice Rutledge in *Sunal* do not add much to the rationale upon which present day postconviction cases must be considered. Both justices agreed with Judge Learned Hand's conclusion that relief should have been granted under one of the many recognized

exceptions to the traditional general rule that a postconviction petition could not serve as a substitute for appeal.[3] Mr. Justice Frankfurter added that "our decision gives dubious and confused answers" to such a question as "when is a writ sought in fact as a substitute for an appeal in a practical view of the administration of justice." (332 U.S. at 184, 67 S.Ct. at 1594). And Mr. Justice Rutledge's dissent also candidly recognized: "Confusion in the opinions there is, in quantity."

The searching reappraisal of the availability of federal postconviction remedies made in the 1963 trilogy cut through and eliminated most of that confusion.

### III

The specific treatment accorded *Sunal* by the Supreme Court since 1947 also makes it clear that a black-letter application of language from the majority opinion in that case to the factual situation presented in this case would be inappropriate. Before the 1963 trilogy was decided, *Sunal* was most frequently cited in support of the principle that the scope of habeas corpus should not be subjected to constrictive limitations. See, e.g. Price v. Johnston, 334 U.S. 266, 295, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); Ahrens v. Clark, 335 U.S. 188, 194, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948); and Burns v. Wilson, 346 U.S. 137, 148, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). In Brown v. Allen, 344 U.S. 443, 503, 73 S.Ct. 437, 444, 97 L.Ed. 469 (1953), in which the death knell was sounded for the highly restrictive rule of Darr v. Burford, 339

---

2. *Sunal* presented the practical and far-reaching question of whether all Jehovah's Witnesses who had been convicted prior to that case and who had therefore been denied the right to raise as a defense in a criminal prosecution the validity of their Selective Service classification, were entitled, after final judgment in their respective cases, to the benefit of Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, which held, subsequent to the convictions of the particular habeas petitioners involved, that such validity could in fact be made the subject of a judicial attack.

3. In United States ex rel. Kulick v. Kennedy, (2d Cir. 1947) 157 F.2d 811, 813, reversed sub nom. Sunal v. Large, *supra*, Judge Learned Hand stated: "After a somewhat extensive review of the authorities twenty-four years ago, I concluded that the law was in great confusion; and the decisions since then have scarcely tended to sharpen the lines. We can find no more definite rule than that the writ is available, not only to determine points of jurisdiction, *stricti juris*, and constitutional questions; but whenever else resort to it is necessary to prevent a complete miscarriage of justice."

U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), *Sunal* was cited only as a case which contained the "conventional statement that habeas corpus should not do service as an appeal."

So far as the 1963 trilogy was concerned, *Sunal* was given a historical footnote citation by Mr. Justice Brennan in Fay v. Noia to illustrate that the Court had in the past recognized that there were many exceptions to an apparent general traditional rule that "Federal prisoners who did not appeal their convictions could not be released on habeas corpus" (372 U.S. at 424, 83 S.Ct. at 841, fn. 35). Mr. Justice Harlan's dissent, on the other hand, recognized that new postconviction standards were in fact being articulated in Fay v. Noia and protested that such new standards, in his judgment, were in direct conflict with existing and established standards, including Sunal v. Large.[4] *Sunal* was not even cited by the majority in Sanders v. United States, the 1963 trilogy case in which the right of federal prisoners to postconviction relief was discussed and determined. Mr. Justice Harlan's dissent in that case, consistent with his dissent in Fay v. Noia, directed attention to the fact that "the Court has consistently held that neither habeas corpus nor its present counterpart, § 2255, is a substitute for an appeal. See, e. g. Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982" (373 U.S. at 25, 83 S.Ct. at 1082).

Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), presented the question of whether a claim of unconstitutional search and seizure could be raised in a Section 2255 proceeding by a defendant who had not raised such a question at trial or on direct appeal. The Government contended that the conventional general rule developed in most of the lower federal court cases that such claims could only be presented on direct appeal, and not under Section 2255, had survived the impact of the 1963 trilogy. See the majority opinion in Thornton v. United States, (1966) 125 U.S.App.D.C. 114, 368 F.2d 822, for the basis of the Government's argument.

 It is obvious, of course, that it is not the introduction or admission of evidence seized in violation of the Fourth Amendment which violates the Constitution. The exclusionary rule which prohibits the admission of such evidence "is simply a prophylactic device intended to deter Fourth Amendment violations by law enforcement officers" (394 U.S. at 224, 89 S.Ct. at 1073).

The Government, therefore, argued in *Kaufman* that the expansion of the scope of Section 2255 to permit defendants who failed to raise a search and seizure issue at trial or on direct appeal would not serve any deterrent function and that therefore the scope of Section 2255 should not be expanded to permit its use as a substitute for an appeal.

That argument, the rationale of which is not dissimilar to that presented by the Government in this case, was rejected by the Supreme Court. The majority opinion in Kaufman stated that "it is true that in Sunal v. Large, 332 U.S. 174, 179, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), we held that 'the writ is not designed for collateral review of errors of law committed by the trial court * * *.'" The Court added, however, that "we there recognized that federal habeas corpus relief for *constitutional* claims asserted by federal prisoners is not limited by that rule." And, most significantly, the Court stated in the next sentence that "Later, in Townsend v. Sain, 372 U.S. 293, 311–312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), we pointed out the vital distinction between the appellate and habeas functions and concluded that habeas relief cannot be denied solely on the ground that relief should have been sought by appeal

4. For a similar dissent based upon *Sunal* in a case in which the Court obviously reached the merits of a post-conviction claim formerly foreclosed by technical rule, see Ladner v. United States, 358 U.S. 169 at 181, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (per Mr. Justice Clark).

to prisoners alleging constitutional deprivations; * * *." (394 U.S. at 223, 89 S.Ct. at 1072).

*Kaufman* recognized that many lower federal courts had denied Section 2255 cognizance of search-and-seizure claims under Section 2255. But the Court noted that such courts "have not generally supplied reasons supporting their apparent departure from this course of our decisions." The decisions ignored were *Fay v. Noia*, *Sanders v. United States*, and the other cases there cited. *Kaufman* determined that in light of the rationale upon which the 1963 trilogy is based, it no longer is permissible for a lower court to rely upon a "bald statement, variously expressed, that a motion under § 2255 cannot be used in lieu of an appeal" (394 U.S. at 222–223, 89 S.Ct. at 1072). *Kaufman* made clear that such black-letter language could no longer be applied, stating that:

> The provision of federal collateral remedies rests more fundamentally upon a recognition that adequate protection of constitutional rights relating to the criminal trial process requires the continuing availability of a mechanism for relief. (394 U.S. at 226, 89 S.Ct. at 1074.)

We recognize, of course, that in laying the language of *Sunal* to one side, *Kaufman* emphasized that *Sunal* had recognized that the *constitutional* claims of federal prisoners were within the exceptions which were not precluded by the traditional general rule against allowing habeas to serve as a substitute for an appeal. We do not, however, read that language of *Kaufman* as suggesting that the only valid exceptions recognized in *Sunal* were those which could be said to rest solely upon a constitutional ground.

*Sunal* recognized that habeas corpus relief had been properly granted in many nonconstitutional but nevertheless exceptional circumstances "where the error

was flagrant and there was no other remedy available for its correction" (322 U.S. 174 at 179, 67 S.Ct. 1588 at 1591). And *Sunal* quoted with approval Chief Justice Hughes' observation in Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 83 L.Ed. 455, that the rule against allowing habeas to serve as an appeal is "not so inflexible that it may not yield to exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent" (332 U.S. at 180, 67 S.Ct. at 1592).

While we believe that a compelling argument could be made in support of the proposition that due process would be violated if any consequence of a judgment of conviction which had been reversed and remanded as to one defendant is sought to be enforced against a co-defendant who did not appeal, we do not believe that question need be reached. We are convinced that the particular circumstances of this case, on its facts, falls well within the type of exceptional situation recognized in *Sunal* and implicitly approved in *Kaufman*. What was said about *Sunal* in *Kaufman* does not, in our opinion, suggest or command that claims which may not rest solely on a constitutional ground may not properly be recognized as an exception to the general rule.

We believe that our conclusion in regard to how *Sunal* must be read in light of the broad implications of the Supreme Court's 1963 habeas trilogy is supported by cases such as Carafas v. LaValle, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), which expressly overruled the traditional mootness rule recognized in the *per curiam* opinion of Parker v. Ellis, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed. 2d 963 (1960).[5] In *Carafas* the Court relied upon the principle articulated in Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), which recognized that many "collateral consequences" may flow from a judgment of

---

5. The traditional mootness rule stated that a federal court could and would not adjudicate the merits of a state prisoner's habeas case if the petitioner had been unconditionally released from custody.

conviction which, as a practical matter, gives a petitioner not in custody "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." The Court therefore concluded that "on account of these 'collateral consequences' the case is not moot." [6]

All of this is to say that in light of the developments in the principles applicable to postconviction proceedings since the 1963 trilogy, we do not believe that it can be said that either *Sunal* or any of its lower federal court progeny articulates a principle which prohibits this Court from entertaining and exercising *coram nobis* jurisdiction.

## IV

The Government's reliance upon Guido v. United States, (7th Cir. 1968) 400 F.2d 73, is misplaced. There are very real differences between the procedural posture and factual circumstances presented in *Guido* and those presented in this case which make that case inapposite.

Judge Fairchild's careful opinion in *Guido* shows that the Seventh Circuit took an entirely different view of the impact of Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) than did the Eighth Circuit in this very case. What was presented and decided in *Guido*, a post-*Dennis* Section 2255 case, must be considered in light of the Seventh Circuit's pre-*Dennis* affirmance of *Guido's* conviction on direct appeal, reported as United States v. Micele, (7th Cir., 1964) 327 F.2d 222. It is apparent from the opinion on direct appeal that, at a pre-*Dennis* trial, defense counsels' motions "for an *in camera* examination of the grand jury testimony for inconsistencies in the testimony of prosecution witnesses * * * was denied"

(327 F.2d at 226–227). On direct appeal, decided before *Dennis*, the Seventh Circuit determined that inconsistencies might exist and that the trial court had not even looked at the grand jury transcript. Before the Court of Appeals ever considered the direct appeal on the merits, it followed the Second Circuit rule and directed the trial judge to examine the grand jury testimony *in camera* and certify whether there were inconsistencies in the testimony and, if so, whether they were material. The trial judge complied with that order and returned a certificate in which he stated that he found no material inconsistencies. The Seventh Circuit, on the basis of its own review, of the grand jury testimony and that given at trial, agreed with the findings in that certificate reviewed the other questions presented, and affirmed the convictions.

It is clear that the Seventh Circuit on direct appeal, decided before *Dennis* was decided, followed the Second Circuit rule as applied in *Santore*, 2 Cir., 290 F.2d 51. *Santore* simply followed the leading case of United States v. Spangelet, (2nd Cir., 1958) 258 F.2d 338, which established the Second Circuit rule to which the Supreme Court made reference in *Dennis* on page 874 of 384 U.S., 86 S.Ct. 1840.

*Dennis* was thereafter decided in 1966. The defendant, in a post-*Dennis* Section 2255 motion, raised the question of whether the later decision of *Dennis* required that his conviction be set aside. The Seventh Circuit in *Guido* affirmed the District Court's denial of the Section 2255 motion because it held that "had this court decided [on direct appeal] there were material inconsistencies, a new trial would undoubtedly have been ordered" (400 F.2d at 73). In regard to *Dennis*, Judge Fairchild stated that

6. We believe the Court's citation to the page of United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248, which stated that unless the remedy of *coram nobis* were recognized "a wrong may stand uncorrected which the available remedy would right" and which also

stated that "although the term [of the sentence] has been served, the results of the conviction may persist," to support the conclusion of *Carafas* quoted in the text is significant in that it again reflects the turn away from form to substance.

"It seems to us that a rule of criminal procedure may be judicially formulated as a desirable guarantee against possible unfairness to a defendant without necessarily deciding that every past proceeding where a less complete guarantee was afforded was so probably unfair as to have denied due process or otherwise impaired constitutional rights." Indeed, our discussion of *Dennis* in part III on page 452 of 262 F.Supp. was relied upon to support Judge Fairchild's conclusion that "The opinion [in *Dennis*] was not couched in terms of constitutional standards" (400 F.2d at 74).

The Seventh Circuit did not in any way intimate that the District Court lacked power and jurisdiction under Section 2255 to make appropriate postconviction inquiry into the merits of the prisoner's claim. Indeed, it noted that if "aggravated circumstances" had been shown, a different question would have been presented; it emphasized that "We are satisfied that in the absence of circumstances in a particular case demonstrating such unfairness as to constitute a distinct denial of due process, *Dennis* does not require the setting aside of a sentence which had become final before *Dennis* was announced."

The Eighth Circuit Court of Appeals, however, contrary to the rationale of the Seventh Circuit's view of *Dennis* as articulated in *Guido,* conclusively determined that this Court's error in this case was of such magnitude that it deprived National Dairy of a fair trial in regard to Counts XI, XII, and XIII of the indictment. It explicitly stated "that the court committed prejudicial error [in regard to those thre counts] in denying the defense the right to inspect the grand jury testimony" (384 F.2d at 461).

There simply can be no doubt that the Court of Appeals was of the opinion that this Court's action in regard to the grand jury transcripts violated "substantial rights" of National Dairy. We cannot accept the Government's implied invitation to disregard that explicit determination of the Court of Appeals. How can it seriously be contended that our error at trial did not also prejudicially violate the same substantial rights of Mr. Wise? The mere fact that Mr. Wise dismissed his appeal can not properly be said to change the nature of error the Court of Appeals has conclusively determined was committed by this Court at the trial of the case. Appropriate recognition of the ·controlling force of our Court of Appeals' opinion in this case requires that we give full effect to that Court's determination. It simply cannot be fairly said that this Court deprived National Dairy of a fair trial in regard to Counts XI, XII, and XIII, without also saying that it deprived Mr. Wise of a fair trial in regard to those same counts.

## V.

It would make a mockery of justice should this Court refuse to exercise its postconviction jurisdiction to dispose of the pending motion as law and justice require. The files and records of this Court reflect that we were concerned from the time we first learned of the dismissal of Mr. Wise's appeal that a situation could arise under which an appellate court might decide National Dairy's appeal in a manner which would clearly establish that it also would have granted Mr. Wise similar relief except for the fact he had dismissed his appeal.[7]

---

7. See transcript of June 29, 1965 at which time the Court stated at page 19: (p. 2877 of the appellate court record):

> As I have reflected on that question, it seems to me that whether a particular defendant who has dismissed his appeal should or should not receive that benefit would, in the final analysis, depend very much on what particular appellate action may be taken in connection with the co-defendant's appeal.

And at page 20 (p. 2878 of the appellate court record):

> I have given the matter a great deal of thought, and I am reasonably convinced that * * * the opportunity to take another look at all sentences in this case, whether a particular defendant did or did not dismiss his appeal, should be retained.

Appropriate proceedings were ordered to protect against that possibility. This Court took steps to make certain that it retained jurisdiction under both Section 3651 and Rule 35 for the Court to dispose of Mr. Wise's case as law and justice required.[8] When we first acted in regard to Mr. Wise's judgment of conviction on May 9, 1968, we vacated and set aside the consequences of payment of the fine and terminated the sentence of probation. At the time that initial action was taken, no other direct or collateral consequences of the conviction were in existence.

The addition of Mr. Wise as a party defendant in the pending civil treble damage cases, however, caused a collateral consequence to come into existence because the possibility that his conviction might be offered in evidence against him became a reality. No one can seriously contend that Mr. Wise's chances of successfully defending those civil actions would not be decreased if the tainted convictions should be admitted in evidence against him in those actions. The plaintiffs in those actions attach such significance to the remaining shell of Mr. Wise's convictions that they are willing to run whatever risks which might be involved in introducing Mr. Wise's convictions in their cases against National Dairy. The collateral consequences which presently exist in regard to Mr. Wise's judgments of conviction are both real and certain. Law and justice require that relief be granted.

And at pages 21–22 (pp. 2879–2880 of the appellate court record):

> The fact, however, that counsel do disagree with the tentative view that I have suggested requires that some power other than Rule 35 be exercised in order to permit this Court * * * to maintain sufficient control over the ultimate sentence to be imposed until after the appeals in this case are determined.

And see generally, appellate court record 2877–2887.

8. See memoranda and orders of December 29, 1964, January 12, 1965, and January 21, 1965.

## VI.

If the law of postconviction relief did not have its "dubious" and "confused" history (to borrow the adjectives used by Mr. Justice Frankfurter in his *Sunal* dissent), we doubt if any court would hesitate to say that a conviction which obviously would have been reversed and remanded for a new trial would ever be permitted to stand for any purpose solely because the defendant, for good and sufficient reasons, had dismissed his appeal. Certainly the distinguished Eighth Circuit panel of Judges Woodrough, Johnsen, and Van Valkenburgh did not take much time or space in Garrison v. Reeves, District Judge, (8th Cir., 1941) 166 F.2d 978, to give justice to defendants who had never even filed appeals.

Hewitt v. United States, (8th Cir., 1940) 110 F.2d 1, shows that six co-defendants were convicted under a two count indictment of robbing the University Bank of Kansas City. The Court of Appeals, on the direct appeal of a single co-defendant, Hewitt, determined that only one valid sentence could be imposed on a single, rather than on both counts, of the indictment. It accordingly ordered that Hewitt's consecutive sentence imposed on count one be vacated and set aside.

Thereafter, Garrison and Harris, who had received identical sentences as those imposed on Hewitt, but who had not appealed, sought the same relief from this District Court as had been accorded Hewitt by the Court of Appeals.[9] The

9. It is impossible to state what sort of a label was placed on the motion or petition Garrison and Harris filed. The Court of Appeals noted that whatever was filed had been "lost." It was perhaps fortunate for Garrison and Harris that they did not label their plea for equal justice as a petition for "habeas corpus" or for *"coram nobis"* because, in those pre-Section 2255 days, such a labeled petition might have been routinely dismissed with prejudice on the ground that such a petition could not serve as a substitute for appeal.

Court of Appeals opinion in *Garrison* show that Judge Reeves expressed doubt about his power to act because the term at which the judgments of conviction were entered against Garrison and Harris had passed. He therefore refused to act. Garrison and Harris accordingly applied to the Court of Appeals for mandamus.

Neither prisoners nor courts were as sophisticated in 1940 as they are today. Garrison and Harris apparently did not complicate their case by making the slightest reference to either the writ of habeas corpus or of *coram nobis*. They presented the simple and judicially uncomplicated question of whether justice requires a district court to accord a defendant who had not appealed the post-conviction benefit of what the Court of Appeals had conclusively determined on the direct appeal of a co-defendant. Had the Court of Appeals wanted to do so, it could have refused to reach the merits of Garrison and Harris' post-conviction claims on the traditional theory that neither habeas corpus, *coram nobis*, nor any other writ with an ancient Latin name, could be used as a substitute for an appeal. But the Court of Appeals obviously did not believe that justice would be done if it approved, on any ground, the district court's refusal to act.

■ We do not believe that justice would be done in this case if this Court should refuse to act on the merits of Mr. Wise's post-conviction claim simply because Mr. Wise dismissed his appeal. We have power and jurisdiction to supplement our prior order of May 9, 1968 and to remove all present and possible future consequences, both direct and collateral, of Mr. Wise's judgment of conviction, a conviction obtained under circumstances identical to those under which his co-defendant, National Dairy, was convicted. It has been finally determined by our controlling Court of Appeals that National Dairy's convictions under Counts XI, XII, and XIII were obtained contrary to applicable law. We conclude that law and justice require that Mr. Wise's judgments of conviction

obtained under the same circumstances be fully set aside and vacated.

## VII

Accordingly, and for the reasons stated, it is

Ordered that the petition for writ of *coram nobis* should be and the same is hereby granted. It is further

Ordered that the judgments of conviction heretofore entered against defendant Raymond J. Wise should be and are hereby vacated, set aside, and held to be void, and that a new trial be ordered in connection therewith. It is further

Ordered that pleas of not guilty shall be entered for defendant Raymond J. Wise in regard to Counts XI, XII, and XIII of the indictment, provided, however, that such counts should and will be dismissed unless the Government shall within five (5) days indicate in an appropriate manner that it has a different view in regard to further prosecution of Mr. Wise than it stated April 15, 1968 in regard to National Dairy in its motion to dismiss those counts as to that defendant.